## Calef v. Parsons et al.

1. *Conveyance of an Estate in Freehold.*—A conveyance of an estate in freehold to commence *in futuro* is good in this State, though there be no particular estate to support it, as was necessary at common law.

2. *Judgments—Notice.*—All persons are presumed to take notice of the judgments of the Circuit Courts, and when dealing with property subject to the liens of such judgments they are bound thereby whether they in fact have such knowledge or not. The judgment is the recorded conclusion of the court and imports verity. Though it may be erroneous and though upon the face of the whole record, including the pleadings in the cause, it may appear that this is such error as would induce a reversal if examined by an appellate tribunal, yet while unreversed and in full force it is nevertheless valid and binding.

3. *Equity Follows the Law.*—Equity follows the law, and where no equitable considerations intervene, or where equities are equal, it will leave the parties to the situation assigned them at law.

4. *A Rule of Equity.*—It is a rule of equity that the vigilant and not the slothful shall enjoy its favor; so where a plaintiff who had obtained a judgment in 1882, which was radically defective, to his injury, had caused an execution to be issued upon it, and after a return of *nulla bona*, permitted his judgment to remain in its defective condition more than six years, and when, after he received all that in point of law he was entitled to on the face of the record, he gave notice for the first time to a purchaser of real estate affected by the judgment that he would apply to the court to have his judgment amended, *it was held* that he was guilty of gross *laches*, and in no condition to ask for equitable relief upon the ground that the purchaser, who was guilty of no actual fraud and who had no actual knowledge of the true state of things, was bound to examine the whole record, and to assume that at some time in the future the plaintiff would obtain an amendment to his judgment.

Memorandum.—Bill in chancery to set aside fraudulent conveyances. Appeal from a decree dismissing the bill rendered by the Circuit Court of Cass County; the Hon. GEORGE W. HERDMAN, Circuit Judge, presiding. Heard in this court at the May term, A. D. 1892, and affirmed. Opinion filed October 17, 1892.

MORRISON & WHITLOCK, solicitors for appellant.

MILLS & McCLURE, solicitors for appellees.

OPINION OF THE COURT, *the Hon. George W. Wall, Judge.*

This was a bill in chancery, filed by Calef against Parsons and Elva J. Saunders, to set aside certain conveyances of real estate made by said Parsons to said Saunders. Decree for defendants. It appears that at the February term, 1882, of the Circuit Court of Cass County, said Calef brought an action of debt against one Melbourne Parsons and said Norman Parsons upon a promissory note, and obtained a judgment "for the sum of $325 debt, which debt may be discharged upon the payment of the sum of $209.56, being the amount of damages so assessed," etc. In entering up this judgment the clerk committed an error, as is apparent when all the files of the case and the minutes of the judge are examined, in providing that the debt should be discharged on payment of the damages. The debt was the principal

and the damages consisted of the interest upon the note.. On October 4, 1878, nearly five years before this judgment was obtained, said Norman Parsons had given a mortgage to said Elva J. Saunders, who was his step-daughter and resided in his family, on Block No. 60, etc., in Beardstown, to secure a promissory note for $100, due January 1, 1881. At that time the said Parsons owned and occupied as his homestead the S. ½ of Lot 3, and all of Lot 4 in Block 46, in Beardstown. He owned no other real estate thereafter.

On the 21st of March, 1882, an execution issued on said judgment, and, following the form of the judgment, provided for discharge of the debt on payment of the damages. It was returned *nulla bona.* On the 2d of September, 1887, said Norman Parsons conveyed the homestead property (one-half Lot 3 and Lot 4, Block 46) to said Elva J. Saunders for the consideration of $700, reserving to himself the possession of the premises during his lifetime, and requiring the grantee to pay all taxes and keep the premises in repair.

On the 21st of June, 1888, he conveyed to her also said Block 60 for the expressed consideration of $800, and on the same day the clerk of the Circuit Court gave said Parsons a receipt for $301.90 in payment of said damages and interest thereon, and all cost.

This money was paid by said Elva J. Saunders, through some other person or persons.

On the following day, June 22d, Calef received the money from the clerk and gave his receipt therefor.

On the 21st of July, 1888, said Elva J. Saunders and Sarah C. Parsons, wife of said Norman Parsons, mortgaged the homestead property to the Mutual Loan and Savings Association to secure a loan of $700.

On the 9th of August, 1888, notice was served on Melbourne Parsons, Norman Parsons and Elva J. Saunders of a motion to be entered in the Circuit Court to correct said judgment, so that the debt should become a part of the same, and on the 16th of October, 1889, said motion was allowed and the judgment was accordingly amended, subject to the intervening rights of third parties.

Execution was issued on this amended judgment and return *nulla bona*, and therefore this bill was filed.

It is not necessary to set out the evidence in detail, though it is not voluminous.

While it appears that Parsons knew there must be a mistake in the judgment, it is not shown that Miss Saunders had any such information. She testifies, and it is not contradicted, that she did not know there was any judgment until about the time she was negotiating with the Mutual Loan and Savings Association for a loan upon the homestead property. An abstract was required and obtained, and thus the fact of a judgment was brought to her notice, but she seems not to have known how much was required to remove the lien thereof. This she left to Mr. Hewitt, the attorney of the association, and, as advised by him, paid the amount already stated. He then passed the title as correct and she obtained the loan. It does not appear that in this she acted in bad faith, or that she had any actual knowledge or reason to suppose that the judgment was not in proper form and for the proper amount.

Nor do we think there is any such want of consideration in either conveyance as to justify the charge of fraud. As to the homestead property, the price paid was not inadequate, in a legal sense, considering that the grantor reserved a life interest; that the deed was not signed by his wife, and that the grantee was to pay the taxes and keep up the repairs; and as to the block, the price actually paid was something over $500, which was probably all it was worth.

The transactions are clouded by the fact that the grantee was the step-daughter of the grantor and had been a member of his family since childhood; that she had rendered him a great deal of assistance in the discharge of his duties as postmaster, and that both parties regarded as a makeweight, if not as a substantial element of consideration, a certain measure of unliquidated obligation growing out of such services. But it is clear that she had earned money in her capacity as a teacher in the public schools, and that to the extent of $700 for the homestead and over $500 for the block

she made actual cash payments of her own funds—regardless of what he or she might have thought was equitably due her on account of said services. With regard to the deed for the homestead, we think it can not be urged that there was such reservation as to make the transaction fraudulent in law. There was no secret trust—no concealed agreement for the benefit of the grantor.

He merely sold her an estate, to begin at his death, for the recited payment of $700, and the agreement on her part to pay taxes and repairs from the date of the conveyance.

A conveyance of an estate of freehold to commence *in futuro* is good in this State—though there be no particular estate to support it, as was necessary at common law. Shackelton v. Sebree, 86 Ill. 717; Vinson v. Vinson, 4 Brad. 138.

Here there was a transaction formal in law and for a consideration not inadequate.

Although it was between relatives, and although the grantor knew the judgment was not for the proper amount, yet we find there is no evidence of actual fraud on her part. Whatever may have been the design of the grantor, the grantee is unaffected in this respect. And though he did know the judgment was erroneous, it is not necessary to infer any fraudulent purpose on his part.

If his creditor was content with a judgment which gave him a lien for only a part of his claim, was there any reason why he should not be permitted to sell or otherwise dispose of his property subject only to the lien actually created by the judgment? Whose business was it to procure a proper judgment?

This brings us to consider what constructive notice the judgment gave the grantee as to the rights of the judgment creditor.

All persons are presumed to know and take notice of the judgment of the Circuit Court, and when dealing with property subject to the lien of such judgments they are bound thereby, whether they in fact have such knowledge or not. The judgment is the recorded conclusion of the court and it

imports verity. Though it may be erroneous, and though upon the face of the whole record, which includes the pleadings in the cause, it may appear that there is such error as would induce a reversal if examined by an appellate tribunal, yet while unreversed and in full force it is nevertheless valid and binding.

It is not to be expected, however, that a person about to purchase property subject to the lien of a judgment should be required to inspect the pleadings and files to ascertain, at his peril, whether the judgment should not have been for a different and larger amount.

The court had judicially determined that matter, and whether right or wrong, such determination was conclusive as long as it was permitted to remain without amendment.

No other rule would enable one to deal safely with property subject to judgment lien. Such is certainly the legal view of the matter, and how will equity regard it? Equity follows the law, and where no equitable considerations intervene, or where equities are equal, it will leave parties to the situation assigned them at law. Here was a plaintiff who had obtained a judgment in 1882, which was radically defective, to his injury. He caused an execution to be issued upon it and after a return of *nulla bona*, the judgment was permitted to remain in its defective condition until 1888, a period of more than six years, when, after he had received all that in point of law he was entitled to on the face of the record, he gave notice for the first time to a purchaser of real estate affected by the judgment, that he would apply to the Circuit Court for an amendment.

It is a rule of equity that the vigilant and not the slothful shall enjoy its favor.

This complainant was guilty of gross *laches*, and was in no condition to ask equitable relief upon the ground that the purchaser of the property, who was guilty of no actual fraud and who had no actual knowledge of the true state of things, was bound to examine the whole record and to assume that at some time in the future the complainant would obtain an amendment of the judgment.

After the judgment had been suffered to remain in its original condition for six years, why should any one who had ever examined the pleading and files be required to so assume at his peril? We are unable to perceive the equitable force of such a proposition. The parties were dealing with legal rights as to property subject to a lien at law; the proceeding was—as to the grantee at least—free from fraudulent knowledge or purpose, and for a reasonably fair and adequate consideration in both instances.

We are clearly of opinion the complainant had no standing in a court of equity and that the decree dismissing the bill should be affirmed.